## JACK DOUGLAS V. THE STATE.

No. 21570. Delivered April 23, 1941.
Rehearing Denied June 11, 1941.
Request for Leave to File Second Motion for Rehearing Denied
(Without Written Opinion) June 18, 1941.

The opinion states the case.

*Burt Barr, O. M. Street,* and *Baskett & Parks,* all of Dallas, for appellant.

*Chas. A. Pippen,* Assistant District Attorney, of Dallas, and

*Lloyd W. Davidson,* State's Attorney, of Austin, for the State, on submission.

GRAVES, Judge.

Appellant was charged by indictment with the offense of theft, a felony, and by the jury found guilty and assessed a punishment of seven years' confinement in the penitentiary.

The facts evidence a rather unique connection of two methods used to obtain money upon a false pretext, and an appropriation thereof. We will endeavor to give a short summary thereof.

Mrs. George B. Simmons, a lady seventy years old, lived in the city of Dallas, Texas, and owned a cottage near the Methodist hospital in that city. Prior to the occurrence here the subject of the indictment, she was called upon at her home, in a house other than this cottage, by a person calling himself Fred C. Blake, who claimed to have a near relative, a rich oil man, who desired to purchase this cottage in order that a nephew, who was ill, could be near this hospital for the purpose of receiving treatment thereat. After ascertaining that Mrs. Simmons desired to sell this cottage property, an agreement as to price was arrived at, and the man Blake stated that he would take her down town on a certain morning and obtain the money from this rich oil man, and close the deal for the cottage. The sick nephew was also exhibited to Mrs. Simmons and seemed to bear out the statement relative to his health. The parties went down town, as agreed, and Blake presumably went into the Cotton Exchange building to obtain the check for the cottage. Upon his return, however, it was claimed that the uncle had just left with some oil men on a deal, and they would have to wait until his return to close the deal. As Blake was walking around the car he discovered a pocketbook, an ordinary bill fold, which he picked up and showed to the parties in the car, among them was Mrs. Simmons. They opened the bill fold and found therein some letters, newspaper clippings, and $55.00 in money. While examining the same a person giving the name of Walter P. Storey came up near the car, evidently looking for something, and discovered that Blake and his companions had found his bill fold. Storey was properly grateful, explaining that he, Storey, was a stockbroker, out of a job at the present time, but with a knowledge of the stock market; that this bill fold contained a letter of credit for thirty thousand dollars, and he offered Blake and party the

money in the fold as a reward for their finding the same. They declined this, but one of the parties, not Mrs. Simmons, requested Storey to give them a tip on some stock on the market. At first Storey demurred, but finally did give them such a tip, and it was suggested that $50.00 be taken and used on that tip. This was done, and after the parties had waited in the car a short time Blake returned with what he said was seven or eight hundred dollars and put it in Mrs. Simmons lap, and said the market had gone up and they had won that much. Mrs. Simmons did not count nor keep the money. Mr. Storey then said "if they wanted to prove that this was the real thing" take his, Storey's, identification card and the thirty thousand dollar credit card and go back to the stock exchange and put it on a certain stock. Blake then left and soon returned to the car, and in a short while went back to the stock exchange, and soon returned in company with another party, with a zipper bag under his arm, who said that he wanted this man (Storey) to sign this credit; he said "You have made seventy thousand dollars, but you will have to prove that it was a cash deal." Storey said "these are new customers and they are not used to stock exchange rules." The zipper man then said "You had done a good day's work, just as quick as you can show me that it was a cash deal, well, I will pay you the seventy thousand dollars." Blake then asked Mrs. Simmons if she had any money, and she said no, she had only a few hundred dollars. After much talk among the men, they claimed to have some kinsfolk who would let them have the money, and some of them left to get the money, but unfortunately the kinsfolk had just left town, but finally they found out from Mrs. Simmons that she had $7,000.00 in liberty bonds in a safety deposit vault. Storey finally showed up with a telegram which he claimed would get him $10,000, and claimed to have borrowed $4,000.00 from a friend. Blake then said he had $7,000.00 in a safety deposit box, and then Mrs. Simmons mentioned her $7,000.00 in liberty bonds, thus making $28,000.00 in all. They finally got her to go to the bank and obtain her $7,000 in bonds and take them home, the hour being late, and the deal was to be completed on the following morning. The next morning Blake sent a taxi for Mrs. Simmons and they all met at a room in the hotel. This supposed cashier then appeared at the room with what Mrs. Simmons thought was the money under his arm and asked the parties if they were ready, if they had the money, "and Mr. Storey said 'Here is my money,' and Mr. Blake said 'Here is seven thousand dollars of mine,' and I said 'Here are my bonds.' He said 'I cannot take them, it is against the rules

of the company here we just cannot take them. Whenever you get ready to show that it is cash, I am ready to pay you $70,000.00'." And the cashier left. Storey and Blake then told Mrs. Simmons that she would have to go and get the money from the bank, but not to go to the bank where she had kept her bonds, but to another bank and get the money; they wanted to keep this deal quiet. They persuaded her that she would only have to get the money from the bank and exhibit it to this cashier, and then she could go and get her bonds back; that she would not lose her money nor her bonds. She had never borrowed from a bank, but finally she went and hypothecated her bonds for seven $1000 bills. Upon her exit from the bank, Mr. Blake was waiting for her, and upon their return to the hotel it was found that the cashier had left. It was then suggested that Blake take the money and go to the stock exchange and get the $70,000.00 and return to the hotel and divide the amount, Mrs. Simmons to get $15,000.00. Just as he left with Mrs. Simmons' money, Storey told him to take $2,000.00 for Storey and buy him that much stock. Blake left and soon returned and said "Oh, mother, we are rich. * * * I placed the whole seventy thousand dollars on the stock that Storey gave me." Mr. Storey became angry and said "you disobeyed orders; go take it down." We quote from Mrs. Simmons' testimony:

"Mr. Blake went to get the money down before the stock went down. * * * He went off and came back in a little bit and the market had gone down, and we had lost our seventy thousand dollars. And he came in and he just fell on my shoes and he says 'Oh Mother—'; Mr. Blake said 'Oh, Mother, say something, say something!' And, well, I was just befuddled; I didn't know anything to say; he just cried like a baby. So Storey said to him 'Be a man,' and he took him by the collar, he jerked him off of me and sat him down on a chair. He said that he was awfully sorry. I was too. He said 'You disobeyed orders and I am not going to help you, but I will see that Mrs. Simmons don't lose anything.' Just about then Mr. Blake had a heart attack; he grabbed his heart and fell on the floor. I thought sure that the man was dying. I said 'Let's get a doctor.' He says 'I think that he will come out from under it' and he went and got a glass of water and threw it in Mr. Blake's face. So, he caught him by the hair twice. He was on the side of his face. He kind of come to. He took him and put him up on the chair. I says 'This man ought to be in a hospital,' and he said 'Are you accustomed to these spells?' and he said 'No, sir.' He said 'Are you a drinking man?' and he said 'No, sir'. He

said 'Have you got any money?' and he said 'Yes, I have nine thousand dollars in a safety deposit box in Monroe, Louisiana.' Mr. Blake was the one who said he had the nine thousand dollars in the safety box in Monroe, Louisiana, and that he would go and get that. He kept on saying 'Mother, say something to me.' He says 'We can get our money back.' He was going to go and get this money so we could get our money back, as Storey could get it back for us; he was going to go. I says 'This is a sick man; he cannot make that trip by himself.' I also said 'You had better send a chauffeur with him; send a chauffeur with him.' Mr. Blake said 'I believe I can make it if I can get in the open air;' and then he went over and left the room, and, then, Mr. Storey said he was going to go to Monroe to get the money, so, Mr. Storey said to me 'Mrs. Simmons, have you got any money? Have you any way to make a living?' I said, 'Well, I am an old woman, and it don't take much for an old woman to eat on.'

"Yes, sir I had seven thousand dollars in Liberty Bonds that were kept in the Mercantile Bank here in Dallas, Yes, sir, I put those up at the First National Bank for seven thousand dollars in cash. I had the seven thousand dollars in cash in my possession. When I came out of the bank I saw Blake— this defendant here, Jack Douglas—there waiting for me. The defendant took from me and my possession that seven thousand dollars; I let him have it, right there. Yes, sir, that seven thousand dollars was current money of the United States of America; that was in one thousand dollar bills, regular current money of the United States of America, and was of the value of seven thousand dollars. All of these matters that I have testified about occurred in Dallas County, in the State of Texas. No, it was not on or about the 8th day of December, 1938; it was the 28th day of December, 1938. That is the date Blake took the money from me. Why, of course the defendant said something to me; yes, he told me that it (the money) would not be out of my hands but a few minutes so that I could go and get my bonds back again when I paid that note; you know, it was a good deal of money; I would get it right back again; sure they did. At the first the defendant told me that the bonds would be alright to exhibit. Yes, he did say that the bonds would never leave my hands; that all that I had to do was to show them."

The man Blake was identified as Jack Douglas, the appellant, and Mrs. Simmons saw him no more until about two

years later in court. It appears from the testimony that it was agreed that Mrs. Simmons was to get her $7,000.00 back immediately after Blake, or Douglas, had showed the money to this cashier with the zipper bag under his arm. Up to this trial she had not gotten such money back.

Appellant complains because of the trial court's failure to grant to him a continuance because of the absence of Billie Barber, whose presence was desired as a witness for him. It appears from the record that there had been one forfeiture of appellant's appearance bond, and two continuances granted to him, this being the third application. This offense was shown to have been committed in December, 1938. Appellant was arrested on April 15, 1940, the case set for trial on April 26, 1940, at which time appellant failed to appear, and his bond was forfeited. Again this case was set for June 21, 1940, at which time this cause was continued on appellant's application, and re-set for June 27, 1940. Again such cause was passed and re-set on appellant's application for July 8, 1940, at which last date same was again continued on application of appellant. We are impressed with the conviction that there is no merit in the effort to obtain a continuance or postponement of this case in order that appellant may have the benefit of this witness' testimony in this case. It is evident, first, that this witness was evading the service of process upon himself, in which she was being seconded by her mother and also by appellant. It is also noted that the motion for a continuance shows upon its face that it is a third motion, or a subsequent motion, and as such the same is defective in that it does not state "That the testimony cannot be procured from any other source known to the defendant." See Art. 544, C. C. P. In fact it is shown from the motion itself that this desired testimony could have been procured from parties other than Billie Barber. We are also of the opinion that the testimony was not of a material character to appellant's defense. This bill is overruled.

Appellant also complains of the fact that a witness, Lester Merriott, who had been subpoenaed and who was present at the trial and placed under the rule, and remained at Dallas for two days, left on the third day and whose absence was the basis of a request for a mistrial.

Appellant's defense was that he could not have been present at the time and place shown in the testimony as December 28,

1938, when this money was taken from Mrs. Simmons, because he was at such time in jail at Hugo, Oklahoma, and that the witness Merriott, a deputy sheriff of Choctow County, Oklahoma, would have so testified had he remained and gone on the witness stand. On the motion for a new trial this witness appeared and denied that he would have so testified, and also testified that he told appellant that he was going to leave at the time he left Dallas. In an effort to show that appellant was in such jail on that date the jail records, which were shown by photostat at the hearing of the motion for a new trial, and from these records, as well as testimony of the witnesses, it was rather conclusively shown that such records had been tampered with and that over the name of a woman prisoner there had been written the name of appellant; thus attempting to evidence his incarceration in such jail in Hugo, Oklahoma, on the date of the alleged offense in Dallas. It is also strongly indicated that probably appellant's wife and an attorney of Hugo might have been instrumental in such an attempted change of this jail record. The testimony of appellant's presence in Oklahoma at the date of the commission of the offense would not have been given by Merriott, so he says, and we do not think that any injury to appellant is shown by his absence, when called, which contemplated absence was known to both appellant and his wife at the time of his leaving.

We think that the injured party was known as Mrs. George B. Simmons, although Mr. George B. Simmons was her husband's name. She gave such as her name, and was shown as such in the statement of facts and seems to have answered to same as her name. She also testified that her first name was Rachel, evidently meaning her given name, the testimony showing that she was called by either name, and we think the indictment alleging her name as Mrs. George B. Simmons corresponded with the proof. See Stokes v. State, 46 Tex. Cr. R. 358, 81 S. W. 1213.

This opinion has gone to an extent not foreseen in its inception, and in the cause of brevity we pretermit a discussion of other matters raised by appellant, all of which have been considered by us and deemed to be without merit.

We think the testimony herein is amply sufficient to show that appellant obtained $7,000.00 from this credulous old lady by means of the pretext that he was merely going to exhibit such money to the cashier and obtain the $70,000.00, and bring

same back to her, with which returned money she could again possess herself of her cherished Liberty Bonds. That such pretext was a false one is shown by previous as well as subsequent actions of appellant. We think that the jury had a right to so conclude from the evidence adduced herein, and so believing this judgment will be affirmed.

## ON MOTION FOR REHEARING.

HAWKINS, Presiding Judge.

Appellant renews complaint because the trial court refuseu his application for continuance based upon the absence of the witness Billie Barber. In our original opinion we said there was no averment in the application that the evidence could not be procured from any other source. In this we were in error. There is such an averment in the application, but we adhere to the conclusion reached that the trial court properly denied the continuance. Furthermore, we think the point was not properly before us and might have been ignored entirely. No bill of exception is brought forward complaining of the action of the court regarding the continuance. We find on the bottom of the application for continuance the following notation over the trial judge's signature. "Defendant's motion for continuance overruled. Defendant excepts." Such a notation does not preserve the point. 4 Tex. Jur., Sec. 151, p. 211 and 212; Williams v. State, 94 Tex. Cr. R. 60, 249 S. W. 852, and cases there cited; Meyers v. State, 109 Tex. Cr. R. 130, 3 S. W. (2d) 438. The reason for the holding is clearly stated in the Williams case. See also, Turner v. State, 109 Tex. Cr. R. 301, 4 S. W. (2d) 58; Branch's Ann. Tex. P. C., Sec. 304; Pinkston v. State, 91 Tex. Cr. R. 644, 241 S. W. 152; Nothaf v. State, 91 Tex. Cr. R. 378, 239 S. W. 215; Fields v. State, 63 Tex. Cr. R. 283, 139 S. W. 978.

Appellant also insists that an issue was raised as to a variance in the name of the injured party as alleged and proven, and that such issue should have been submitted to the jury. Our attention is called to the fact that in Stokes v. State, 46 Tex. Cr. R. 357, 81 S. W. 1213 (cited in our original opinion) that the court submitted a charge on the issue of variance. The defendant in that case asked a special instruction on the issue which the court gave. In discussing the question this court referred to Art. 444 C. C. P. (now Art. 401) which in part reads: "When a person is known by two or more names it shall be sufficient to state either name." This court then observed, "The court seems to have required more in the instruction than is

demanded by the statute." No special instruction was requested in the present case. If appellant relied on his exceptions to the charge we entertain grave doubts of them being sufficiently specific under the requirements of Art. 658 C. C. P. to call the trial court's attention to the contention now made by appellant. One exception reserved to the charge was for "submitting to the jury the issue of theft of property belonging to Mrs. George B. Simmons because there is fatal variance between the allegations and proof upon said issue." It was appellant's contention in the court below and upon appeal that if guilty at all it was of embezzlement or swindling and not theft. From the exception mentioned the trial court could have reasonably understood that the variance claimed referred to that contention and not a claimed variance as to the name of the injured party.

The indictment alleged the injured party's name to be "Mrs. George B. Simmons." Reference to the statement of facts reveals that when Mrs. Simmons was called to the witness stand she testified: "My name is Mrs. George B. Simmons * * * my maiden name is Rachel." Later in the trial she was recalled to the stand and said, "I am the same Mrs. George B. Simmons that testified in this case yesterday." We find that all through the testimony she is called only "Mrs. Simmons," except that one witness referred to her as "Mrs. Rachel Simmons." It is upon the testimony as indicated that appellant bases his claim of variance. We are of opinion the issue was not raised. Hensley v. State, 101 Tex. Cr. R. 31, 274 S. W. 135 is a case almost exactly like the present one, and the holding there supports our conclusion here.

It is again urged that the evidence does not support a conviction of theft by false pretext. This has caused us to further consider the facts brought forward. They are sufficiently set out in our original opinion. It occurs to us that they lead to the inescapable conclusion that appellant and his companions entered into an elaborate plan with the ultimate purpose to secure from Mrs. Simmons her money, and that all their dealings with her were fraudulent and accompanied with thinly veiled false pretexts to accomplish their designs.

The motion for rehearing is overruled.